## MOHAWK PETROLEUM CO. et al. v. COM-MISSIONER OF INTERNAL REVENUE.

### No. 10373.

Circuit Court of Appeals, Ninth Circuit.
March 29, 1945.

Jacob H. Sapiro and Edwin V. McKenzie, both of San Francisco, Cal., for petitioner.

Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key. Samuel H. Levy, Arthur Manella, and Valentine Brookes, Sp. Assts. to Atty. Gen., for respondent.

Before WILBUR, DENMAN, and STEPHENS, Circuit Judges.

WILBUR, Circuit Judge.

The petitioners herein are the Mohawk Petroleum Company and the transferees of the property of that company who are liable as such to the extent of the property respectively transferred to them, for the income tax of the Mohawk Petroleum Company for the years 1936 and 1937.

The facts are stipulated and the controversy arises over the claim by the Mohawk Petroleum Company for the allowance of deduction from gross income for losses alleged to have been suffered by it by reason of the abandonment of four oil wells during the taxable years because oil in paying quantities was no longer produced therefrom. The question of deduction allowance depends largely upon the manner in which the company set up items of depreciation upon its books and has heretofore claimed allowance therefor in its income tax returns. It was the practice of the company to charge to capital the cost of materials incorporated into wells drilled on its leaseholds. So-called "intangible" drilling expenditures were deducted as current expenses and did not enter into the capital cost of the wells set up in the company's books.

In claiming depreciation, the company treated each leasehold as a unit and used the unit of production (a barrel of oil) as a basis, prorating the capital costs of drilling all the wells on the lease to all the oil that it was estimated could be produced from the lease and deducting each year as depreciation the cost thus proportioned to the oil produced during the year on the lease. By this method the entire capital

costs of all the wells upon the lease would be returned to the company as depreciation allowance at the time the amount of the oil estimated as recoverable therefrom had been exhausted. This method of accounting has been approved by the Commissioner. It is based upon the theory that depreciation is due not to wear and tear or obsolescence of the well equipment, but to the depletion of the oil supply, which renders the well equipment useless.

The question of the effect upon claims for depreciation of the failure of an individual well or wells to produce oil arose for the first time in connection with the abandonment by the company of a number of wells in 1936 and 1937.

The company claims that it is entitled to deduct from its gross income for the year as a loss for that year the capitalized cost of the abandoned well or wells less their salvage value and less the accrued depreciation. Having done this to ascertain the net income of the company for the current year, the company would deduct this claimed loss from the capitalized cost of all the wells on the leasehold for the purpose of estimating future depreciation allowances for that lease.

The Commissioner claimed that no allowable loss was sustained by the abandonment of an individual well because the company's method of accounting and reporting income taxes contemplated the shutdown of wells as and when the oil produceable by the wells was exhausted. The recovery of the capitalized cost thereof was to be secured to the company by the annual depreciation allowance based upon the unit of production costs for the production life of the whole lease. The Commissioner based his ruling upon the applicable statutes and regulations (Revenue Act of 1936, c. 690, 49 Stat. 1648, Sec. 23, 26 U.S.C.A. Int. Rev.Acts, page 827; Treasury Regulations 94, Article 23(e) (3)).

This regulation (Art. 23(e) 3, supra) deals among other things with the return of capital through depreciation where "the depreciable assets of a taxpayer consist of more than one item and depreciation, whether in respect to items or groups of items, is based upon the average lives of such assets." In such case it is provided that losses claimed as due to normal retirement of individual items are not recoverable as losses but only by way of the depreciation allowance for the group of assets because the average depreciation contemplates the retirement of assets both before and after the average life has been reached.[1] The rule also deals with depreciation based upon the longest life asset or maximum life of a single asset.[2]

The company each year reestimated the oil content of the lease and reestimated the unit cost for the remaining oil content; whereas, if the same unit rate of production costs had been used, the situation would be more nearly analogous to the longest life unit or maximum life rule.[3]

The real question, it will be observed, is not whether the company shall receive a return of capital, by way of allowance for depreciation or loss, which is conceded, but whether it shall receive it in installments

[1] The rule states: "If the depreciable assets of a taxpayer consist of more than one item and depreciation, whether in respect of items or groups of items, is based upon the average lives of such assets, losses claimed on the normal retirement of such assets are not allowable inasmuch as the use of an average rate contemplates a normal retirement of assets both before and after the average life has been reached and there is, therefore, *no possibility of ascertaining any actual loss under such circumstances until all assets contained in the group have been retired.* (Italics ours.) In order to account properly for such retirement the entire cost or other basis of assets retired, adjusted for salvage, will be charged to the depreciation reserve account, which will enable the full cost or other basis of the property to be recovered."

[2] In the case of *classified accounts,* if it is the consistent practice of the taxpayer to base the rate of depreciation on the expected life of the *longest lived asset* contained in the account, or in the case of single item accounts if the rate of depreciation is based on the maximum expected life of the asset, a deduction for the basis of the asset (adjusted as provided in Section 113(b), 26 U.S.C.A. Int.Rev.Acts, page 865, and articles 113(a) (14)-1, 113 (b)-1, and 113(b)-2) less its salvage value is allowable upon its retirement. (See articles 23(1)-1 to 23(1)-10).

[3] The respondent states the matter as follows: "Had the depreciated rate been originally computed on the basis of the absolute maximum estimated reserves which a particular field might contain, and such estimated reserves never subsequently scaled down to coincide ultimately with actual reserves, only then would the full cost of all the assets not be recovered through depreciation allowances when the last barrel of oil was extracted."

as depreciation allowance covering the productive life of the unit (the lease) adopted by the company for the keeping of its books, or whether the full amount for an individual well shall be recovered as a loss for the well when it becomes dry.

■ Much of the petitioners' argument is based upon illustrations as to the desirability of recovery of the cost of each well as it is abandoned. But the books of the company are kept as though there was but one well, or at least one expenditure for that purpose on each lease. Given this method of bookkeeping, we see no reason to question the finding of the Commissioner and the decision of the Board of Tax Appeals which denied to the company the right to charge as a loss the capital investment in an individual well which is retired because it had become dry.

■ The petitioners claim that in their bookkeeping system they entered the cost of each individual well and the amount of oil produced therefrom and argues therefrom that the loss of the individual well due to the exhaustion of oil could be ascertained. In that regard the tax court pointed out that the amount of oil expected to be produced from each individual well is not shown on the books and there is no method for estimating it.[4] There was, therefore, no basis for ascertaining the loss, if any, due to the premature shut down of the well, if it was premature. So far as the books were concerned the wells shut down may have produced the full quota of oil expected therefrom.

It should be observed that it is not claimed that the shutdown of these individual wells was due to any unexpected cause.

It follows that the deficiency fixed by the Commissioner for the years 1936 and 1937 must be sustained.

### Recoupment.

■ If the petitioners are denied the right to deduct the cost of the abandoned wells as a loss when abandoned they are entitled to recover the same in the depreciation allowance for that year and subsequent years. Because of this fact, the Commissioner has notified the petitioners that they are entitled to deductions for depreciation for the year 1938, which would decrease the tax payable by them by $5,660.87. The difficulty about it is, however, that the statute of limitations has run in favor of the government upon this item which was not claimed by the petitioners because such claim would have been inconsistent with their attempt to establish the right to deduct as a loss the depreciated book value of the abandoned wells. Petitioners contend, however, that if they are defeated in their principal claim herein they should be allowed to recoup from the amount found to be due from them for 1936 and 1937 the amount of the overassessment for the year 1938 ($5,660.87).

The Supreme Court, on December 6, 1943, decided this question adversely to the contention of appellant, (Commissioner of Internal Revenue v. Gooch Milling & Elevator Co., 320 U.S. 418, 64 S.Ct. 184, 88 L.Ed. 139) holding that the Board of Tax Appeals was prevented by § 272(g) of the Internal Revenue Code, 26 U.S.C.A. Int. Rev.Code, § 272(g), from entertaining such a claim.

Order affirmed.

DENMAN, Circuit Judge (concurring in result).

I concur in the result. The discussion of the method of computing depreciation of the machinery is upon a moot question and entirely unnecessary.

The petition to the Tax Court was for a redetermination of a claimed deficiency determined by the Commissioner, arising from the Commissioner's disallowance of a claimed deduction for the value of abandoned machinery. In such a proceeding, before the question of the validity of tax-

---

[4] As the Tax Court pointed out: "The fallacy of petitioner's argument lies in the fact that it presupposes the *life* of the *tangible equipment* of a well to be coextensive with the life of the lease or so long as the lease on which the wells are located is productive. * * * *Such equipment may be and often is used at other wells. The stipulation shows that the wells involved were abandoned, but there is no evidence showing that the equipment thereon was also abandoned because it had lost its usefulness or that the abandonment of the* wells caused depreciation of the equipment in excess of that normally sustained. Ex-13 and $35,026.52 'as losses consequent cept that the stipulation shows that petitioner 'wrote off' the amounts of $5,044.-13 and $35,026.52 'as losses consequent to the abandonment of its' wells and claimed losses in its income tax returns in such amounts, there is no evidence that the equipment was actually retired or abandoned because it had lost its economic usefulness and had no more than scrap or salvage value or no value.* " (Italics ours.)

payer's method of depreciation can arise, the burden of proof is upon the taxpayer to show (1) that the equipment was in fact abandoned and (2) its value after abandonment. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440, 54 S.Ct. 788, 78 L.Ed. 1348.

The taxpayer showed the abandonment of the oil well at which the machinery was installed but not the abandonment of the equipment or its value when the well was abandoned. The Tax Court so found, as follows:

"* * * The stipulation shows that the wells involved were abandoned, but there is no evidence showing that the equipment thereon was also abandoned because it had lost its usefulness or that the abandonment of the wells caused depreciation of the equipment in excess of that normally sustained. Except that the stipulation shows that petitioner 'wrote off' the amounts of $5,044.13 and $35,026.52 'as losses consequent to the abandonment of its' wells and claimed losses in its income tax returns in such amounts, there is no evidence that the equipment was actually retired or abandoned because it had lost its economic usefulness and had no more than scrap or salvage value or no value."

The Commissioner's brief and argument relied upon this failure to establish any claim at all, the necessary foundation of any discussion of whether taxpayer chose a proper method of depreciation. The majority opinion states this finding of the Tax Court in its footnote 4, but ignores the position of the Commissioner stated in his brief and his argument, as follows:

"Moreover, as the Tax Court recognized, apart from any other considerations, taxpayer's claimed deduction must be denied here, since there is absolutely nothing in the record to indicate that the well equipment in question had actually become worthless during the taxable years. Since losses are allowable only on closed and completed transactions, no deduction for a claimed loss will be permitted unless it is clear that the property in question has in fact become worthless during the year the loss is claimed. Lucas v. American Code Co., 280 U.S. 445, 50 S.Ct. 202, 74 L.Ed. 538, 67 A.L.R. 1010; United States v. S. S. White Dental Co., 274 U.S. 398, 47 S.Ct. 598, 71 L.Ed. 1120; Lambert v. Commissioner of Internal Revenue, 10 Cir., 108 F.2d 624; De Loss v. Commissioner of Internal Revenue, 2 Cir., 28 F.2d 803, certiorari denied,

279 U.S. 840, 49 S.Ct. 254, 73 L.Ed. 987. Treasury Regulations 94, Article 23 (e)-3."

In the absence of any proof of these necessary underlying facts, the decision of the majority opinion on the claimed deduction is mere dictum.